**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **VEN-JIAO (TONY) WANG,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 21-3111 (JEB)** |
| **NEW MIGHTY UNITED STATES TRUST,** *et al.*, | |
| **Defendants.** | |

## MEMORANDUM OPINION

The decades-long family dispute over the multibillion-dollar fortune left behind by Taiwanese plastics-magnate brothers Yung Tsai (Y.T.) Wang and Yung Ching (Y.C.) Wang lands once again on this Court's doorstep. This time, three of Y.T.'s children, his second wife, and one grandson — now the appointed personal representative of his estate — bring this lawsuit seeking to either void or reform the New Mighty United States Trust (NMUST), an American trust that Plaintiffs allege was created and then heavily funded in contravention of their patriarch's wishes. Their dispute is really with Y.T.'s other children who helped to create the trust, which deprives Plaintiffs of a significant part of their potential inheritance. They nonetheless have sued NMUST itself; Clearbridge, the company tasked with managing the trust; and New Mighty Foundation, the main beneficiary of the trust. Those Defendants now move to dismiss, arguing that the entire lawsuit is time barred, issue precluded, and does not state any claims. The Court will deny that Motion as to all but one count.

1

## I.    Background

As it does for every motion to dismiss, the Court draws its facts from the Complaint and takes them as true.

Few families have wealth like the Wangs.  Perhaps relatedly, few families have litigation histories as vast and as extensive as the Wangs.  Wang ex rel. Wong v. New Mighty U.S. Tr., 322 F.R.D. 11, 15 (D.D.C. 2017) ("[A]s is often true on both sides of the Pacific: more money, more problems.").  Our tale begins with two brothers, Y.T. and Y.C., who turned an impoverished childhood in Taiwan into a family fortune rivaling the GDP of Monaco in scale. See ECF No. 84 (Am. Compl.), ¶¶ 23, 29–31.  Over their decades serving as the co-founders of Formosa Plastics Group, a highly successful manufacturing conglomerate, they accumulated billions of dollars' worth of shares in the FPG companies, most of which were held and managed — consistent with Taiwanese custom — by an FPG employee, identified in the Complaint as "Mr. Hung."  Id., ¶¶ 32–36.  The brothers were also prolific family men: Y.C. had a total of nine children over the course of three marriages, while Y.T. had eight children across two marriages. Id., ¶¶ 24, 26, 28.  This particular lawsuit focuses on Y.T.'s assets, so disputes among Y.C.'s progeny will be detailed only where necessary.  As many of the relevant family members share a last name, the Court will refer to parties by their first name for clarity's sake and with no disrespect.

Sometime in the early 2000s, spurred by Mr. Hung's impending retirement, Y.T. and Y.C. decided to set up a series of shared overseas trusts to hold their immense wealth.  Id., ¶ 38. According to the Complaint, the brothers sought to ensure that their hard-earned wealth stayed within the family, as opposed to being distributed to other entities.  Id., ¶ 50.  At some point, Y.C. drafted a document titled "Main Principles of Y.C. Wang and Y.T. Wang in Establishing

the Wang Trust Company" detailing these desires, including their wish to include every child as a beneficiary of the overseas trusts.  Id., ¶¶ 49, 52.  There, the trouble began.  The Complaint alleges that two of Y.C.'s children from his third wife — Susan and Sandy — along with two of Y.T.'s children from his first wife — William and Wilfred — who are collectively referred to as the "Four Directors," conspired with Mr. Hung to dupe their fathers and half-siblings and created trusts incongruent with Y.T. and Y.C.'s wishes.  Id., ¶¶ 7, 39–48, 63–76, 78.  To this end, the Four Directors excluded Y.T. from meetings regarding the trusts and kept the terms of each trust hidden, ostensibly with the goal of withholding Y.T.'s money from his other children and dishonoring Y.T.'s wishes.  Id., ¶¶ 8, 42, 48, 84–88, 182.  In May 2001, the Four Directors instructed lawyers to create a trust in Bermuda — the Wang Family Trust — that excluded all the children as beneficiaries.  Id., ¶ 63–65.  Additional trusts were formed in 2002 and 2005, resulting in a total of four Bermuda trusts: the Wang Family Trust (established May 2001), the China Trust (established 2002), the Universal Link Trust (established on May 5, 2005), and the Vantura Trust (established on May 9, 2005).  Id., ¶¶ 65, 68, 70.

On May 3, 2005, just a few days before establishing the Universal Link and Vantura Trusts, the Four Directors declared the New Mighty U.S. Trust in Washington, D.C.  Id., ¶ 72. This one American trust is the instrument at issue in this case.  Like the other overseas trusts, rather than benefiting Y.T.'s children, NMUST names the New Mighty Foundation, a private foundation managed by the Four Directors, as a beneficiary.  Id., ¶¶ 20–21, 110.  On the management side, NMUST is controlled by Clearbridge, LLC, which has since delegated its administrative and investment powers to — no surprise here — the Four Directors.  Id., ¶¶ 22, 72.  Although rendered a bit opaque by the various corporate structures at play, the upshot of the trust is that it leaves Y.T. and Y.C.'s wealth to be controlled and used by the Four Directors, to

3

the exclusion of their remaining children.  Id., ¶ 160.  For years, Y.T. was allegedly kept in the dark about the true nature of the trusts and led to believe that the overseas trusts reflected his desire to benefit all his children.  E.g., id., ¶¶ 84–88.

In 2008, although hard to believe given his sophistication, Y.C. died without a will.  Id., ¶ 89.  His death spawned sprawling litigation amongst his descendants over his assets, including one lawsuit that previously came before this Court.  Id., ¶ 90; Hsu v. New Mighty U.S. Tr., 2020 WL 588322 (D.D.C. Feb. 6, 2020).  Notably, around 2010, Winston, one of Y.C.'s sons from his second wife and cousin to our Plaintiffs, began bringing lawsuits to invalidate the overseas trusts and recover Y.C.'s assets, including a lawsuit in Bermuda over the Bermuda trusts.  See Am. Compl., ¶¶ 90, 138.  Even though Y.T.'s assets were also held in the very trusts at issue in those lawsuits, the Four Directors "obstructed Y.T. and . . . Plaintiffs from discovering the true nature of Winston's legal actions" to prevent them from learning that the trusts did not reflect Y.T.'s intentions.  Id., ¶ 93.  For example, when she asked why her children were not receiving distributions from the trusts, Madame Chou, Y.T.'s second wife, was told that Winston's litigation had frozen the trusts, and that was the reason they had not yet started receiving payments — never mind the fact that the children were not beneficiaries of the trusts to begin with.  Id., ¶ 136.  At some point after Y.C.'s death, Y.T. directed an FPG employee to educate his children about the overseas trusts, including NMUST.  Id., ¶ 106.  In those meetings, the FPG employee, allegedly at the behest of the Four Directors, withheld copies of the trust terms from Y.T.'s family, provided an ambiguous summary sheet that concealed the fact that NMUST could not have individual beneficiaries, and falsely told the family that they would be beneficiaries of NMUST.  Id., ¶¶ 107–16.

4

Around 2011, Y.T. fell ill.  Id., ¶ 120.  His oldest son, William, obtained power of attorney over his affairs to set up a fifth trust in Bermuda in 2013, the Ocean View Trust.  Id., ¶ 127.  Plaintiffs would not learn of this trust until years later, in August 2019.  Id.  Y.T. passed away in 2014 at the age of 92, and his Taiwan estate was settled in 2016.  Id., ¶¶ 128–31.  The fight over his overseas assets continues on.

In 2019, Y.T.'s three children from his second marriage — Tony, Tammy, and Janis — along with their mother, Madame Chou, discovered that they were not beneficiaries of the overseas trusts, despite years of assurances that they would be provided for following Y.T.'s death.  Id., ¶¶ 26, 134–37.  Tony then joined his cousin Winston's Bermuda litigation over the Bermuda trusts.  Id., ¶ 150.  Separately, Madame Chou and her children invoked this Court's diversity jurisdiction to file this suit in November 2021 against NMUST, New Mighty Foundation, and Clearbridge, which the Court will collectively refer to as "NMUST."  See ECF No. 1 (Compl.), ¶¶ 13–15.  The counts asserted therein allege various grounds for invalidating or reforming the trust and for obtaining restitution from NMUST, which now holds many of Y.T.'s company shares.  Id., ¶¶ 83–102.  NMUST moved to dismiss, arguing in part that Plaintiffs were not the real parties in interest and therefore could not bring claims on behalf of Y.T.'s estate.  See ECF No. 14 (First MTD) at 26–31.  Around the same time, Plaintiffs sought to have Kevin Wang, Y.T.'s grandson through Tony, appointed administrator of his estate, and to amend the Complaint to add counts under Taiwan law.  See ECF Nos. 30-1 (Mot. to Am.) at 1–2; 34 (Reply to Mot. to Am.) at 17 n.2.  With both motions pending, the Court ultimately stayed the case to permit Plaintiffs to finish pursuing Kevin's appointment, in hopes that it would moot some of the real-party-in-interest objections made by NMUST.  See Minute Order of Dec. 12, 2022.  Following a lengthy sojourn in the probate division of D.C. Superior Court and the finalization

5

of the appointment in August 2025, Plaintiffs filed an Amended Complaint on October 10, 2025, to add Kevin to the lawsuit as the representative of Y.T.'s estate. See Am. Compl. NMUST has now moved again to dismiss the case in its entirety. See ECF No. 85 (MTD).

## II.      Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of an action where a complaint fails to "state a claim upon which relief can be granted." Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, [if] accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). In evaluating a 12(b)(6) motion, a court must "treat the complaint's factual allegations as true and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged." Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citation and internal quotation marks omitted); see also Iqbal, 556 U.S. at 678. A court need not accept as true, however, "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the complaint. Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)). More specifically, a complaint will be dismissed under Rule 12(b)(6) as "conclusively time-barred" if "a trial court 'determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" Momenian v. Davidson, 878 F.3d 381, 387 (D.C. Cir. 2017) (quoting Firestone v. Firestone, 76 F.3d 1205, 1209 (D.C. Cir. 1996)).

**III.    Analysis**

Defendants lob a trifecta of objections to the lawsuit: it is untimely, the core of Plaintiffs'

claims is issue precluded, and the Complaint fails to state any claims for relief.  The Court will

address each contention in turn.

**A.    Timeliness of Suit**

The first of NMUST's major challenges concerns timing.  According to Defendants,

Kevin and his family have knocked on the courthouse door too late, arguably decades after their

claims accrued, and that fact alone should bar their case from progressing any further.  See MTD

at 18–20.  This dispute breaks down further into three distinct areas of debate, which the Court

will examine in sequence: the applicable statute of limitations, the date on which the claims first

accrued, and whether Plaintiffs' Amended Complaint may relate back to their Original

Complaint.

As a threshold matter, courts sitting in diversity apply federal procedural law and the

choice-of-law rules of the forum state to identify the governing substantive law.  Hanna v.

Plumer, 380 U.S. 460, 465 (1965).  Statutes of limitations are considered substantive for these

purposes.  Jinks v. Richland County, 538 U.S. 456, 465 (2003).  Applying D.C.'s choice-of-law

rules, the Court agrees with the parties that D.C. law governs questions of timeliness: D.C. Code

§ 19-1301.07(1) provides that trusts are interpreted according to the law designated in the trust

instrument, and here the trust document asserts that D.C. law applies "in all respects" to

NMUST.  See ECF No. 85-7 (NMUST Instrument) at 9.

**1.    *Governing Statute of Limitations***

The parties agree that the governing statute of limitations is three years for Plaintiffs'

D.C.-law claims.  See MTD at 19–20; ECF No. 86 (Opp.) at 32; D.C. Code § 12-301(a)(8).  The

remaining causes of action generate a touch more controversy: NMUST contends that the same limitation also applies, while Plaintiffs insist that Taiwan's fifteen-year statute of limitations governs their Taiwan-law claims, and laches extends the time to sue for their equitable claims. See MTD at 19; Opp. at 33–34. The Court need not wade into these waters, however, because even assuming that the statute of limitations is uniformly three years — the least favorable period for Plaintiffs — it finds that the claims survive.

### 2. *Date of Accrual*

The next inquiry asks: three years from when? Under D.C. law, "a cause of action accrues for purposes of the statute of limitations when the plaintiff has either actual notice of her cause of action or is deemed to be on inquiry notice." Diamond v. Davis, 680 A.2d 364, 372 (D.C. 1996). Inquiry notice is "that notice which a plaintiff would have possessed after due investigation." Id. The doctrine is equitable, "designed to prevent the accrual of a cause of action before an individual can reasonably be expected to discover that he has a basis for legal redress." Bussineau v. President & Dirs. of Georgetown Coll., 518 A.2d 423, 430 (D.C. 1986). At the same time, inquiry notice continues to protect defendants from stale claims by holding plaintiffs to a standard of reasonable diligence; plaintiffs must act assiduously in investigating possible claims, as the doctrine will not "protect those careless of their rights at the expense of the right of the party accused to defend herself." Diamond, 680 A.2d at 379.

Because inquiry notice is "a question of fact," Capitol Servs. Mgmt., Inc. v. Vesta Corp., 933 F.3d 784, 791 (D.C. Cir. 2019) (quoting Diamond, 680 A.2d at 372), movants seeking dismissal face a high burden when they argue that the statute of limitations has run in a case of inquiry notice. Firestone, 76 F.3d at 1209 (noting that "courts should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint" because

"statute of limitations issues often depend on contested questions of fact"). In such instances, courts have held that dismissal is appropriate "only if the complaint on its face is conclusively time-barred," Commonwealth Land Title Ins. Co. v. KCI Techs., Inc., 922 F.3d 459, 464 (D.C. Cir. 2019) (quoting Bergman v. Perles, 747 F.3d 873, 875 (D.C. Cir. 2014)), and "no reasonable fact-finder could find otherwise." Sandza v. Barclays Bank PLC, 151 F. Supp. 3d 94, 116 (D.D.C. 2015). This is an exceedingly high bar; "the complaint cannot be dismissed [as time barred] unless it appears beyond doubt that the plaintiff can prove no state of facts in support of his claim that would entitle him to relief." Jones v. Rogers Mem'l Hosp., 442 F.2d 773, 775 (D.C. Cir. 1971).

Defendants accept, as they must at this stage, the Complaint's assertion that Plaintiffs lacked actual notice of their claims until 2019. See MTD at 24, 35. They maintain, however, that Plaintiffs had inquiry notice at three different points, all of which would render their 2021 lawsuit hopelessly late: in 2005 (when the trust was established), in 2010 (when Winston began bringing suits over the Bermuda trusts), and in 2015 (when the media reported that Winston had formed an alliance with Tony and his siblings). Id. at 22–29. NMUST drops the 2015 argument in its Reply, so the Court will treat that point as conceded. See ECF No. 87 (Reply) at 7–11; Wooten v. U.S. Senate, 2021 WL 1564444, at *3 (D.D.C. Apr. 21, 2021) ("The traditional approach to dropped arguments in this Circuit is to treat them as conceded."). As for the remaining two contenders, both analyses rely on inferences that the Court cannot draw at this moment. That is fatal for Defendants' endeavor.

First, NMUST argues that Y.T., the original holder of these claims, should have known when the trust was established in 2005 that it did not accurately reflect his intentions. See MTD at 22–25. Its main support for this assertion is that Y.T. was a savvy and wealthy businessman

9

"running a multinational multibillion-dollar business conglomerate," and the exercise of reasonable diligence would have alerted him to the wrongdoing occurring with his trusts. Id. at 25. Plaintiffs counter with their own facts, maintaining that Y.T.'s understandable reliance on his fiduciaries to manage his finances, his lack of English fluency, and his advanced age — along with the Directors' intentional concealment of the trust's true nature, see Am. Compl., ¶¶ 42–48, 72–73, 84–85, 134, 171 — negate any contention that he should have discovered the discrepancies with NMUST at the time it was formed. See Opp. at 11–15.

As for Winston's litigation, Defendants argue that starting in 2010, the extensive media coverage of his nephew's suing over the overseas trusts should have triggered a duty to investigate for Y.T. They also argue that after Madame Chou and her children were informed in 2009 that they would receive distributions from the trusts, they should have realized something was amiss when they did not begin receiving payments. See MTD at 25–28. In Plaintiffs' view, conversely, they had received ample assurances that Winston's litigation did not threaten their portion of the trusts, and they had been told that the lawsuit was the reason that their distributions did not begin flowing shortly after the trusts were established. See Am. Compl., ¶¶ 93, 136. Tangled up in a web of lies, Plaintiffs allege, they had no reason to suspect something was amiss. Id., ¶¶ 109–15, 134.

Readers will be quick to note that both disputes boil down to a battle of the facts: which account of the family's knowledge and diligence is more convincing? Was Y.T. a savvy businessman or an exploited elder? Were Plaintiffs faultlessly kept in the dark or inexcusably careless? At the motion-to-dismiss stage, it does not matter. The factual dispute alone is reason enough to side with Plaintiffs and permit the suit to continue. Vesta Corp., 933 F.3d at 789 (finding "dismissal under Rule 12(b)(6) erroneous" when inquiry notice involved "an unresolved

factual question on th[e] record"); Perry v. Scholar, 696 F. Supp. 2d 91, 96–97 (D.D.C. 2010) (concluding that factual dispute involving inquiry notice precludes grant of motion to dismiss).

Defendants certainly may be right that Plaintiffs had inquiry notice earlier, and they are free to raise such objections again at summary judgment on a more developed record.  But at this juncture, their argument amounts to asking this Court for improper factfinding.  In re Est. of Delaney, 819 A.2d 968, 982 (D.C. 2003) ("What constitutes acting reasonably under the circumstances to investigate the problem is a 'highly factual analysis' . . . .") (quoting Diamond, 680 A.2d at 372).  The Complaint plausibly alleges facts to support Plaintiffs' narrative that they did not discover their claims until 2019 and no reasonable diligence could have accelerated the process.  Momenian, 878 F.3d at 391.  The Court will accordingly proceed from a claim-accrual date of August 2019.  See Am. Compl., ¶ 147.

> 3.    *Relation Back Under Rule 17(a)(3)*

Plaintiffs face one more hurdle on the road to surviving the timeliness challenge.  Even accepting their pleaded accrual date of August 2019, the Amended Complaint, filed in October 2025, would have come a few years too late.  The doctrine of relation back provides their only way forward: if the Amended Complaint can relate back — *i.e.*, be treated as filed on the date of the Original Complaint in 2021 — then it will be considered timely.

As a threshold matter, the Court finds, and the parties agree, that the Federal Rules of Civil Procedure, and federal law more generally, govern the question of relation back, even if the broader question of timeliness is embedded within state law.  See MTD at 29 (analyzing relation back under Rule 17); Opp. at 22–23 (same).  "Erie and its offspring cast no doubt on the long-recognized power of Congress to prescribe housekeeping rules for federal courts even though some of those rules will inevitably differ from comparable state rules."  Hanna, 380 U.S. at 473.

For that reason, federal courts have regularly applied federal rules governing relation back in diversity cases. Krupski v. Costa Crociere S.p.A., 560 U.S. 538, 547 (2010) (applying Rule 15 relation back to amended pleading in diversity-negligence case); Levinson v. Deupree, 345 U.S. 648, 652 (1953) (holding that "federal practice controls the question" of relation back in state-law tort case). This Court will likewise analyze relation back under the Federal Rules.

To start where the parties are aligned: neither contests that amendment of the Complaint is appropriate here under Rule 15, which governs when amended pleadings may relate back. See Opp. at 22–23. In cases where the amendment also involves the substitution or addition of a plaintiff, however, courts have found that Rule 17 imposes additional restrictions on relation back. See 6A Wright & Miller's Federal Practice & Procedure § 1555 (3d ed. 2026) (citing cases).

Rule 17 provides that suits may be brought only by "real part[ies] in interest." Keeping in mind that the question of who constitutes a real party in interest can be a knotty one, a 1966 Amendment to the Rule also provides that a "court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." Fed. R. Civ. P. 17(a)(3). Once a real party in interest has been substituted into the action, relation back allows the action to "proceed[] as if it had been originally commenced by the real party in interest." Id. The committee note on the 1966 amendment mentions that the relation-back provision was added "in the interests of justice" to prevent unfair forfeiture of claims. See Fed. R. Civ. P. 17 advisory committee's note to 1966 amendment.

Read literally, Rule 17 appears to automatically allow relation back every time a real party in interest is added to a suit absent unreasonable delay. In practice, however, courts have

12

cabined the Rule's liberality, limiting relation back to circumstances free of gamesmanship —
*e.g.*, where the determination of the proper party to sue was difficult, or where the plaintiff made
an understandable mistake and did not unreasonably delay seeking substitution.  Cortlandt St.
Recovery Corp. v. Hellas Telecomms., S.a.r.l, 790 F.3d 411, 421 (2d Cir. 2015) (explaining Rule
17 relation-back provision was added "to avoid forfeiture and injustice") (quoting 6A Wright &
Miller's Federal Practice & Procedure § 1555 (3d ed. 2014)); In re Engle Cases, 767 F.3d 1082,
1113–15 (11th Cir. 2014); Advanced Magnetics, Inc. v. Bayfront Partners, Inc., 106 F.3d 11, 20
(2d Cir. 1997); U.S. for Use & Benefit of Wulff v. CMA, Inc., 890 F.2d 1070, 1074 (9th Cir.
1989); Esposito v. United States, 368 F.3d 1271, 1275 (10th Cir. 2004); Lans v. Gateway 2000,
Inc., 84 F. Supp. 2d 112, 120 (D.D.C. 1999); see also Fed. R. Civ. P. 17 advisory committee's
note to 1966 amendment (articulating two bases for relation back: "when determination of the
proper party to sue is difficult or when an understandable mistake has been made").  Permitting
relation back in those instances prevents the forfeiture of an otherwise timely claim and avoids
unfairness, all the while blocking unscrupulous plaintiffs from taking advantage of the Rule.  See
6A Wright & Miller's Federal Practice & Procedure § 1555 (3d ed. 2026) ("[T]he [relation-back]
rule should be applied only to cases in which substitution of the real party in interest is necessary
to avoid injustice."); Fed. R. Civ. P. 17 advisory committee's note to 1966 amendment
(cautioning that relation-back provision "should not be misunderstood or distorted" to apply in
situations where plaintiff is abusing relation back).

Using those criteria, courts have barred Rule 17 relation back in cases where a predatory
lawyer filed hundreds of placeholder lawsuits before going and finding actual plaintiffs for a
mass-torts case, In re Engle Cases, 767 F.3d at 1113; where the newly added plaintiff had made
not even the barest effort to discover its status as a real party in interest earlier, Dekalb Cnty.

13

Pension Fund v. Transocean Ltd., 817 F.3d 393, 412 (2d Cir. 2016); and where creditors of a contractor filed suit knowing they had no cause of action, only to obtain written assignment of the subcontractor's claim months later. Benefit of Wulff, 890 F.2d at 1073–75.

In Defendants' view, Plaintiffs' suit falls into this subset of improper party substitutions. As with their claim-accrual arguments, Defendants stake their position here on inferences that the Court is not permitted to draw. They ask it, for example, to conclude from Plaintiffs' actions that they intentionally filed a placeholder lawsuit, all the while knowing that the estate representative (the now-appointed Kevin) was the only real party in interest who could bring suit. See MTD at 36–37. For evidence, NMUST offers up two facts that allegedly show that Plaintiffs knew about the personal-representative requirement when they filed suit here. First, it points to Tony's seeking of appointment as Y.T.'s estate administrator in the Bermuda action earlier that year; second, NMUST highlights how quickly Plaintiffs moved to appoint Kevin after filing this lawsuit. Id. All this, NMUST alleges, shows that Plaintiffs knew all along that their original lawsuit was improper under Rule 17. Ultimately, NMUST asks this Court to conclude, as a matter of law, that Plaintiffs were aware that they themselves could not sue but sued nonetheless.

That is a tall order. The Court cannot say that is it obvious from the face of the Complaint that Plaintiffs nefariously brought their initial suit as a placeholder. The facts stated in the Complaint lend just as much support to Plaintiffs' interpretation as they do to NMUST's. In the family's telling, they sued believing that they could bring certain claims directly and believing that an exception to the representative requirement applied to the rest. See Opp. at 23–29. Anticipating NMUST's objections, they nonetheless moved to appoint Kevin to reduce friction within the lawsuit. See Reply to Mot. to Am. at 17 n.2. Indeed, even with Kevin now

14

appointed, the original Plaintiffs continue to contend that there are certain claims that may be brought by them directly. See Am. Compl., ¶¶ 212–50. In contrast, cases where Rule 17 has barred relation back feature plaintiffs that admit knowing that they could not bring suit or that offer essentially no justification for their conduct. E.g., Benefit of Wulff, 890 F.2d at 1073–75. As with their claim-accrual objections, Defendants may have a winning argument here. But if they do, it is contingent on myriad facts that the Court may not infer on a motion to dismiss. The Court accordingly declines to find that Plaintiffs' conduct constituted gamesmanship as a matter of law.

As for potential prejudice to Defendants, the Court concludes that any such is minimal. NMUST argues that Plaintiffs unreasonably delayed seeking appointment, but little indicates that this is true. When the Court stayed this case in December 2022, it did so with the intent of letting Plaintiffs appoint a representative, in part because Defendants had protested the absence of one. See Minute Order of Dec. 12, 2022. Plaintiffs then timely sought administrator appointment; much of the long delay in this case can be credited to the lengthy probate-court proceedings, which lasted from 2022 to 2025. See ECF No. 82 (JSR), ¶ 1. It would seem rather unfair to punish Plaintiffs now for doing as the Court and Defendants requested. Despite the passage of time, moreover, the core of the Complaint and its key claims remain intact, save for the substitution/addition of Kevin as a plaintiff. Compare Am. Compl., ¶¶ 155–250, with ECF No. 30-2 (Proposed Am. Compl.), ¶¶ 101–47. While the latest Amended Complaint includes additional facts, as discussed earlier, NMUST does not contest the availability of relation back on the basis of improperly amended pleadings. The Court will therefore permit the Amended Complaint to relate back under Rule 17.

As a final point, NMUST seems to suggest at times that the original Plaintiffs — Y.T.'s

15

children and second wife — should be dismissed from the suit entirely as not real parties in interest, leaving Kevin as the only Plaintiff.  See MTD at 29–33.  This contention is entirely embedded within their argument against relation back, and it is not until the Reply that Defendants suggest that this might serve as an independent Rule 17 objection.  See Reply at 3. The Court will not dismiss those Plaintiffs under a challenge that NMUST only halfheartedly raises a beat too late.

*       *       *

In sum, at this stage the Court accepts that Plaintiffs' claims accrued in 2019, that their Amended Complaint relates back to their initial one and so is deemed filed in 2021, and that they therefore meet even a three-year statute of limitations.  The Court accordingly will deny NMUST's Motion to Dismiss the claims as time barred.

B.      Issue Preclusion

NMUST next asserts that Plaintiffs may not dispute Y.T. and Y.C.'s intent in creating the trust before this Court because, in their view, Plaintiffs have already litigated — and lost — on this issue before.

The doctrine of collateral estoppel, also called issue preclusion, is meant to conserve judicial resources by "prevent[ing] a party from relitigating an issue that has already been decided."  Jackson v. Off. of the Mayor, 911 F.3d 1167, 1171 (D.C. Cir. 2018).  Under this doctrine, "an issue of fact or law that was actually litigated and necessarily decided is conclusive in a subsequent action between the same parties or their privies."  McAlister v. Potter, 843 F. Supp. 2d 117, 120 (D.D.C. 2012) (citing Allen v. McCurry, 449 U.S. 90, 94 (1980)).  For both federal and state law, "[c]ollateral estoppel requires that (1) 'the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior

16

case;' [and] (2) 'the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case.'" Montgomery v. IRS, 40 F.4th 702, 709 (D.C. Cir. 2022) (quoting Martin v. DOJ, 488 F.3d 446, 454 (D.C. Cir. 2007)); Colvin v. Howard Univ., 257 A.3d 474, 482–82 (D.C. 2021) (requiring "'the issue in the new case . . . was actually litigated and decided in the prior case,' (2) 'by a final and valid disposition on the merits,' (3) 'after a full and fair opportunity for litigation by the same parties or their privies,' (4) 'under circumstances where the determination was essential to the judgment, and not merely dictum'") (quoting Smith v. Jenkins, 562 A.2d 610, 617 (D.C. 1989)).

Recall that after Y.T. and Y.C.'s deaths, the fragmented Wang clan descended into a tangle of international litigation nearly as sprawling as their family tree. One branch of those disputes led to Bermuda, where Winston and Tony jointly contended that Y.C. and Y.T. did not intend to create trusts that did not benefit their families and that they should therefore recover the trust assets. After an 80-day trial in 2021, the Bermuda court found, among other things, that Y.T. and Y.C. had not been mistaken or misled when they created the Bermuda trusts. See ECF No. 85-35 (Bermuda Judgment), ¶¶ 13–14.

NMUST now holds up that judgment to assert that Plaintiffs' central arguments are issue precluded. In its view, the factual issue of whether Y.T.'s intentions were fairly captured in the creation of NMUST has already been decided by another court. See MTD at 40. And since that contention lies at the heart of Plaintiffs' case here, they say, the suit must be dismissed.

The Court begins — and ends — with the first prong of analysis: is the issue in this case the same as the one previously litigated in Bermuda? NMUST says yes: both suits turn on what the brothers intended to do when they created the overseas trusts. Id. at 44. After all, the Bermuda court interpreted the very documents that Plaintiffs submit here to substantiate their

17

allegations.  Id. at 45.  NMUST also notes that the Bermuda court considered and rejected the same conspiracy theory that Plaintiffs now again allege in their Complaint — namely, that the Four Directors colluded with Mr. Hung to shut Y.T. and Y.C.'s other families out of their inheritance.  Id. at 46.

There is one major wrinkle with Defendants' theory: the two cases concern entirely different trusts.  While the Bermuda court made judgments and findings exclusively as to the Bermuda trusts, this case is about Y.T.'s intentions as to the American trust.  No one contends that the Bermuda court made any findings as to NMUST.  In fact, the Bermuda court itself outlined the limited scope of its adjudication, couching its findings as specific to the Bermuda trusts and even going so far as to deny discovery related to NMUST for lack of relevance.  See Bermuda Judgment, ¶ 13; Opp. at 36.  When evaluating whether two issues are identical for issue-preclusion purposes, it is notable "if the first court undertakes an express identification of the issues that it has not decided."  6A Wright & Miller's Federal Practice & Procedure § 4417 (3d ed. 2026).

Defendants' position turns primarily on a pragmatic view of preclusion, arguing that Y.T. surely had the same intent as to all the overseas trusts created around the same time.  See MTD at 44.  Common sense suggests that they might well be right.  But because the result of preclusion is an early boot from the courthouse, courts must maintain stringent, perhaps even formalistic, standards in deciding whether plaintiffs have already had their day in court.  Even if NMUST is right that the question of intent as to each trust will likely rise or fall together, issue preclusion requires identical issues.  Similar, even closely intertwined, issues are not enough.  Jahr v. District of Columbia, 968 F. Supp. 2d 186, 191 (D.D.C. 2013) (citing District of Columbia v. Gould, 852 A.2d 50, 56 (D.C. 2004)); Athridge v. Aetna Cas. & Sur. Co., 604 F.3d 625, 634

18

(D.C. Cir. 2010) ("[I]ssue preclusion does not apply where issues are only similar, but not identical . . . .").

While Defendants may be right that resolution of our case will involve interpreting documents previously reviewed in the Bermuda case, that does not render the issues identical. A single document detailing Y.T. and Y.C.'s intentions can supply evidence for two distinct issues — in this case, Y.T.'s intentions as to two distinct sets of trusts — without rendering the issues one and the same as a matter of law. Put more concretely, just because Y.T. and Y.C. understood the terms of the Bermuda trusts does not logically entail that they understood the terms of the separate D.C. trust at issue here. The terms might be different, what their advisors told them might have been different, and their intentions for the trusts might have been different. A previous court finding on Y.T.'s intent as to his Bermuda trusts thus does not bind this Court's adjudication of his intent as to his American trust.

As the Court declines to find issue preclusion on this ground, it need not evaluate the remaining requirements or delve into additional questions raised by NMUST's issue-preclusion arguments, such as the mutuality of bound parties or the application of different governing legal standards.

C.       Merits

NMUST offers one final set of contentions in its Motion, this time assailing the merits of each of Plaintiffs' ten causes of action. In its view, not one states a claim on which relief could be granted.

19

1.      *Counts 1, 2, 3, and 4: Invalidation of the Trust*

The Court begins with Plaintiffs' first four counts, all of which seek invalidation of the trust on various grounds: lack of intent, undue influence, lack of authority, and mistake. NMUST moves to dismiss each.

In Count 1, Plaintiffs allege that Y.T. did not intend to create the trust with the terms found in NMUST, even if he did intend to create a trust generally.  See Am. Compl., ¶¶ 155–64. The main dispute between the parties is whether that intent requirement means a general "intent to create a trust" (as Defendants contend) or an "intent to create this specific trust" (as Plaintiffs allege).  See MTD at 51; Opp. at 46.  The statutory text sides with Plaintiffs.  D.C. Code § 19-1304.02(a)(2) requires that a settlor have the "intention to create the trust," not just any trust. The use of the definite "the" seems quite intentional; in contrast, the immediately preceding requirement mandates that a settlor simply "ha[ve] the capacity to create a trust."  D.C. Code § 19-1304.02(a)(1).  Although Defendants point to cases where the requirement is phrased as "intent to create a trust," MTD at 51 (quoting Duggan v. Keto, 554 A.2d 1126, 1134 (D.C. 1989)), that wording is not the governing law.  The D.C. Code is.  Further, those cases all involve litigants who argued that the settlor lacked the intent to create a trust at all; the use of the indefinite article is more likely a natural consequence of the parties' framings of their arguments than a legally significant semantic choice.  E.g., Duggan, 554 A.2d at 1134; Cabaniss v. Cabaniss, 464 A.2d 87, 91 (D.C. 1983); He Depu v. Yahoo! Inc., 950 F.3d 897, 904 (D.C. Cir. 2020) (applying D.C. law).

Count 2 similarly survives.  Defendants' arguments amount to disputes about whether Plaintiffs will be able to prove undue influence off the pleaded facts.  See MTD at 51.  The Court need not decide now; undue influence is a "mixed question of fact and law," the kind

20

inappropriate for resolution at this stage.  In re Ingersoll Tr., 950 A.2d 672, 692 (D.C. 2008).

Plaintiffs' Complaint alleges "sufficient factual matter, [if] accepted as true, to 'state a claim to

relief that is plausible on its face.'"  Iqbal, 556 U.S. at 678 (2009) (quoting Twombly, 550 U.S.

at 570).

Plaintiffs will also be permitted to proceed with Count 3.  Y.T.'s family seeks

invalidation of the trust on the ground that the Four Directors and Mr. Hung lacked authority to

transfer his assets into the trust.  See Am. Compl., ¶¶ 185–95.  Defendants mainly argue that

there is no applicable law requiring authorization and no cause of action for a "lack of authority"

claim.  See MTD at 52.  This is wrong: the D.C. Court of Appeals voided a trust amendment on

these very grounds in Garner v. University of Texas at Austin, 317 A.3d 333, 338 (D.C. 2024).

The Court will, however, dismiss Count 4, which seeks invalidation on the basis of

mistake.  When "the terms of the trust [a]re affected by a mistake of fact or law," D.C. Code

§ 19-1304.15 permits a court to "reform the terms of a trust . . . to conform the terms to the

settlor's intention."  That provision makes no mention of invalidation.  A different provision

conversely states that a trust can be invalidated when "its creation was induced by fraud, duress,

or undue influence."  D.C. Code § 19-1304.06.  Taken together, these sections indicate that

reformation is the exclusive remedy for a mistake, while invalidation is reserved for other

grounds.  Count 4 will therefore be dismissed for failure to state a claim.

>    2.    *Count 5: Reformation of the Trust*

Plaintiffs' claim for reformation due to mistake will be permitted to proceed.  As just

detailed, D.C. Code § 19.1304.15 expressly permits reformation for mistakes of fact or law.

Defendants' quibbles over the facts offer little weight.

>    3.    *Count 6: Unjust Enrichment*

So, too, with Count 6.  Plaintiffs allege that NMUST was unjustly enriched when Mr. Hung transferred Y.T.'s company shares into the trust without his permission.  Defendants respond that the enrichment is not unjust because Mr. Hung was authorized to make the transfers.  See MTD at 53.  Perhaps, but that factual issue is the very dispute at the heart of this case.  Defendants also mount an apparent-authority defense, contending that NMUST reasonably believed that Mr. Hung was authorized to make the transfers when it accepted the assets.  See Reply at 27–28.  Because that defense turns on NMUST's perceptions of Mr. Hung's authority, like every other factual dispute, it does not warrant dismissal at this stage.

### 4.      *Count 7: Conversion*

As for Plaintiffs' final count under D.C. law, Defendants insist that before a conversion claim may be brought, the rightful owner must make a demand for the return of his property, and there was no such demand here.  See MTD at 53.  Not so.  A claim for conversion accrues "when the defendant takes some action that a reasonable person would understand to be either an act of conversion or inconsistent with a bailment."  Malewicz v. City of Amsterdam, 517 F. Supp. 2d 322, 335 (D.D.C. 2007) (citing In re McCagg, 450 A.2d 414, 416 (D.C. 1982)).  The demand requirement is specific to the situation where the property holder initially lawfully possessed the property and simply continued to hold it; in that instance, a demand is needed to "render continued possession unlawful and show its adverse nature."  Calvetti v. Antcliff, 346 F. Supp. 2d 92, 106 (D.D.C. 2004) (quoting Savoy Const. Co., Inc. v. Atchison & Keller, Inc., 388 A.2d 1221, 1223 (D.C. 1978)).  There is no such need here where Mr. Hung has disposed of Y.T.'s company shares by transferring them to the trust.  That would clearly be an act of conversion if Mr. Hung lacked authorization to do so.

### 5.      *Counts 8, 9, and 10: Taiwan-Law Claims*

Finally, the Court reaches Plaintiffs' three claims under Taiwan law.  The parties' debate consists primarily of offering up differing interpretations of such law — *viz.*, what specific powers attach to a nomineeship for Counts 8 and 9, and whether a nonparty can invoke Article 113 for Count 10.  See MTD at 54–55; Opp. at 53–55.  On both questions, the parties submit opposing expert declarations that, not surprisingly, come to opposite conclusions, each accompanied by notably thin argumentation.  The Court acknowledges that issues of foreign law are matters that can be resolved at the motion-to-dismiss stage.  See Fed. R. Civ. P. 44.1.  In this case, however, it finds that Defendants' sparse briefing — clocking in at just under four pages across three counts and two briefs — and submitted expert declaration are not enough to require dismissal of Plaintiffs' claims at this stage, especially in light of Plaintiffs' opposing declaration. Cf. Hsu, 2020 WL 588322, at *6.  If, at summary judgment, Defendants wish to renew their contentions with more involved briefing, they will be welcome to do so.

## IV.     Conclusion

The Court, accordingly, will grant in part and deny in part Defendants' Motion to Dismiss.  An Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  May 26, 2026

23